**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO. ______________________

AMY PTALIS and STEFANIE L. MALVIN, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

MOUNT SINAI MEDICAL CENTER OF FLORIDA, INC.,

Defendant.
________________________________________/

CLASS ACTION

JURY TRIAL DEMANDED

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Amy Ptalis ("Plaintiff Ptalis") and Stefanie L. Malvin ("Plaintiff Malvin") (together, "Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members," or the "Class"), bring this Class Action Complaint against Defendant Mount Sinai Medical Center of Florida, Inc. ("Mount Sinai" or "Defendant"), and allege as follows based on personal knowledge as to Plaintiffs' own acts and on information and belief as to all other matters:

**NATURE OF THE ACTION**

1. This is a class action arising from Mount Sinai's collection and disclosure of website visitors' sensitive health-related information and electronic communications to Google LLC ("Google") and StackAdapt Inc. ("StackAdapt") (collectively, the "Third-Party Recipients"), without prior notice and consent, through tracking technologies Mount Sinai deployed on its website, www.msmc.com (the "Website").

2. Mount Sinai is the largest private, independent, not-for-profit teaching hospital in South Florida. Headquartered on Miami Beach, it operates its main hospital campus and a network of outpatient, physician-practice, and emergency locations throughout Miami-Dade and Monroe Counties, and reported approximately $1.21 billion in revenue for fiscal year 2024. Through the Website, patients and prospective patients locate Mount Sinai physicians by name and specialty, research the medical services and conditions Mount Sinai treats, and begin scheduling appointments with specific physicians.

3. The Website functions as a care-seeking tool. Two of its three primary navigation items—"Find a Doctor" and "Explore Medical Care"—exist to connect visitors with a specific physician or clinical service. Visitors search the Website by condition, specialty, or physician name; open physician profile pages that identify the physician and his or her medical specialty; open service pages dedicated to specific areas of medicine; click a button to schedule with a specific physician; and answer the Website's prompt asking, "Have you been seen by a Mount Sinai doctor with this specialty in the last three years?"

4. Unbeknownst to Website visitors, Mount Sinai has knowingly implemented tracking technologies operated by the Third-Party Recipients—including Google Analytics, the Google tag, including its transmissions to Google's advertising-measurement systems, and StackAdapt's advertising pixel (collectively, the "Trackers" and each individually, a "Tracker")—that acquire visitors' communications in real time. When a visitor opens a physician profile or a clinical service page, the Trackers transmit the full address and title of that page—which name the specific physician and the medical specialty the visitor is pursuing—together with the page from which the visitor arrived, to Google and to StackAdapt. Those transmissions are joined to persistent identifiers: Google's Analytics client identifier, a Google Ads identifier, and,

where the visitor is signed into a Google account, the visitor's logged-in Google account cookies; and StackAdapt's persistent advertising identifiers. When the visitor clicks to schedule with that physician and answers the Website's patient-status prompt, further events reporting those actions are transmitted to Google Analytics, to Google's advertising-conversion endpoint, and to StackAdapt's conversion pixel.

5. What aggravates Mount Sinai's conduct is the timing and manner of these disclosures. Visitors are never asked to agree to any terms before they interact with the Website. The Website presents no Terms of Use. Since approximately spring 2026, the Website has displayed a cookie notice, but it requests no consent: it is a notice with an "I understand" button, all tracking is enabled by default, it refers only to "functional and analytics purposes" without mentioning advertising, and the Trackers fire as the page loads, before a visitor can read or respond to it. Mount Sinai's Privacy Policy refers only generically to "vendors," "analytics vendors," and "pixels, cookies, or similar tools"; it names neither Google nor StackAdapt; and it states that it does not apply to protected health information—treating a patient's search for his or her own physician as ordinary "activity on our website."

6. This interception of private electronic communications occurs without appropriate notice to visitors and without their consent, in violation of (1) the Florida Security of Communications Act, Fla. Stat. § 934.01, et seq. ("FSCA"), and (2) the federal Electronic Communications Privacy Act, 18 U.S.C. § 2511, et seq. ("ECPA").

7. Under the FSCA, it is unlawful to intentionally intercept, endeavor to intercept, or procure any other person to intercept any wire, oral, or electronic communication without the consent of all parties to the communication. Mount Sinai violated the FSCA by deliberately embedding tracking technologies on its Website that procured the Third-Party Recipients to

intercept visitors' private electronic communications—including the physicians and medical specialties they sought, and their scheduling actions with those physicians—in real time, without the knowledge or consent of any party to those communications.

8. Under the ECPA, similar protections exist at the federal level. Although the ECPA contains a one-party consent exception, that exception does not apply here because Mount Sinai procured the interceptions for the purpose of committing a criminal or tortious act—specifically, the unauthorized use and disclosure of individually identifiable health information for commercial advantage in violation of the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d-6.

9. Independent of these statutory violations, Mount Sinai owed Plaintiffs and Class Members a duty of confidence and breached it. Plaintiffs are Mount Sinai patients. They and other Class Members communicated with Mount Sinai through its Website for the purpose of locating, and obtaining care from, Mount Sinai physicians. Mount Sinai accepted that trust and then disclosed those nonpublic communications to advertising and analytics companies with no role in furnishing care—without consent or privilege.

10. Further, Mount Sinai solicited and obtained visitors' sensitive health-related data and put that data to use for advertising, analytics, conversion-measurement, retargeting, and patient-acquisition purposes, without ever compensating visitors for the value it received. Mount Sinai has thereby been unjustly enriched at Plaintiffs' and Class Members' expense.

11. Mount Sinai's conduct is also an unfair and deceptive trade practice. Plaintiffs therefore assert a claim under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq. ("FDUTPA")—solely for the declaratory and injunctive relief that Fla. Stat. §

501.211(1) makes available to "anyone aggrieved by a violation" of the Act, and expressly not for damages.

12. Through this action, Plaintiffs seek to hold Mount Sinai accountable for these privacy violations, to obtain appropriate remedies for affected individuals, and to prevent the continued procurement of interception of electronic communications through Defendant's Website.

## PARTIES

13. Plaintiff Amy Ptalis is an adult citizen and resident of the State of Florida, residing in Miami Beach, Miami-Dade County, Florida. Plaintiff Ptalis is a Mount Sinai patient.

14. Plaintiff Stefanie L. Malvin is an adult citizen and resident of the State of Florida, residing in Miami Beach, Miami-Dade County, Florida. Plaintiff Malvin is a Mount Sinai patient.

15. Defendant Mount Sinai Medical Center of Florida, Inc. is a not-for-profit corporation organized and existing under the laws of the State of Florida, with its principal place of business at 4300 Alton Road, Miami Beach, Florida 33140, located in Miami-Dade County. Mount Sinai operates a hospital campus of approximately 670 beds and a network of outpatient, physician-practice, and emergency locations throughout Miami-Dade and Monroe Counties, and reported approximately $1.21 billion in revenue for fiscal year 2024. Mount Sinai develops, maintains, operates, and controls the Website, including the tracking technologies deployed on it.

## JURISDICTION AND VENUE

16. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges claims arising under federal law, namely the ECPA, 18 U.S.C. § 2511, et seq.

17. This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

18. This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; there are more than 100 members in the proposed Class; and at least one member of the proposed Nationwide Class is a citizen of a State different from Defendant, which is a citizen of Florida.

19. This Court has personal jurisdiction over Defendant because Mount Sinai is a Florida corporation with its principal place of business in Miami Beach, Florida, within this District, and operates and controls the Website from Florida. The acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

20. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2). Defendant resides in this District and maintains its principal place of business at 4300 Alton Road, Miami Beach, Florida, in Miami-Dade County. A substantial part of the events or omissions giving rise to the claims occurred in this District: the tracking conduct at issue is deployed from Mount Sinai's centralized Website, which is operated, maintained, and controlled from this District, and Plaintiffs accessed the Website and communicated with Mount Sinai from Miami-Dade County, where the interception of their communications occurred.

21. Assignment to the Miami Division is proper because Defendant resides in Miami-Dade County, Plaintiffs reside in Miami-Dade County, and the claims arose there.

## FACTUAL ALLEGATIONS

### A. Overview of Website Tracking on Healthcare Websites

22. Many websites employ tracking technologies that collect personal data about users' online activities. These technologies have become ubiquitous across the internet, collecting vast amounts of data about user behavior, preferences, and interests. In the healthcare context, they are particularly concerning because they can capture sensitive medical information, including the types of care a user is researching, the specific physicians and specialists a user is seeking, and the conditions a user or a user's loved one may be experiencing.

23. The concern is at its highest on a hospital's own website. A patient who searches a hospital's website for a specialist, opens that specialist's profile, and clicks to schedule an appointment is not browsing idly; the patient is communicating with his or her health care provider about the care he or she needs. The interception of those communications reveals highly personal medical conditions, treatment interests, and care-seeking behaviors to third parties without patients' knowledge or consent.

24. As detailed below, Mount Sinai has implemented tracking technologies on its Website that result in the Third-Party Recipients' unauthorized interception of visitors' electronic communications.

### B. Mount Sinai's Website

25. The Website is Mount Sinai's primary digital channel for patients and prospective patients. According to Similarweb traffic data, the Website receives approximately 425,000 visits per month, with the United States accounting for roughly 86% of that traffic—approximately 370,000 U.S. visits per month and approximately 4.4 million U.S. visits per year.

26. The Website's primary navigation consists of three items: "Find a Doctor," "Find a Location," and "Explore Medical Care." The Website also features a prominent search function that invites visitors to "Search for doctors, specialties and locations," and that returns matching physicians and medical-care pages as the visitor types.

27. Each Mount Sinai physician has a dedicated profile page on the Website. The address of each profile page takes the form www.msmc.com/doctor/[physician-name]/, and its page title takes the form "Dr. [Physician Name], MD - Mount Sinai Medical Center." Each profile identifies the physician's medical specialty—for example, "Pulmonary • Critical Care"—and displays a button inviting the visitor to "Schedule with Dr. [Name]."

28. Each clinical service line likewise has a dedicated service page, with an address and title that identify the area of medicine—for example, www.msmc.com/pulmonary/ ("Advanced Pulmonary Care") and www.msmc.com/urology/ ("Mount Sinai Urology Services, Miami").

29. When a visitor clicks the "Schedule" button on a physician's profile, the Website presents a prompt asking, "Have you been seen by a Mount Sinai doctor with this specialty in the last three years?" and requiring the visitor to select either "No, I'm a new patient" or "Yes, I'm an existing patient" and click "Submit." A visitor who identifies as an existing patient is then directed to "Schedule Your Follow-Up with MyChart," Mount Sinai's patient portal.

30. Accordingly, the address and title of the pages a visitor requests on the Website, and the actions the visitor takes on them, reveal the substance of the visitor's communication with Mount Sinai: the specific physician the visitor is seeking, that physician's medical specialty, the clinical service the visitor is researching, and the visitor's steps to obtain care from that physician.

### C. The Tracking Technologies Deployed on the Website

31. Google is a multinational technology company headquartered in Mountain View, California. Google operates one of the world's largest online advertising platforms and generates most of its revenue through targeted advertising services. Google's business model depends on collecting vast amounts of user data across its products and services, which it then leverages to deliver targeted advertisements. Mount Sinai has implemented Google's analytics and advertising technologies—including Google Analytics and Google's advertising-measurement functions—on its Website, deployed through Google Tag Manager containers GTM-WDZV2BG and GTM-TBPC9W.

32. Google Analytics is a web analytics service offered within the Google Marketing Platform that allows website operators to track visitors' actions on their website in order to measure traffic and engagement, personalize content, and implement targeted advertising. That Google tag transmits visitors' communications not only to Google Analytics but also to Google's advertising-measurement endpoints (www.google.com/ccm/collect and www.google.com/measurement/conversion), together with the Google Ads conversion-linker identifier (auid, from the _gcl_au cookie). The Google tag is a JavaScript-based tracking technology that loads automatically and immediately whenever a user visits a page containing the code, and executes in the background without any visible indication to the user.

33. Google's tracking technologies transmit details of each user interaction to Google through requests to endpoints including analytics.google.com, www.google.com/ccm/collect, and www.google.com/measurement/conversion. Along with those events, the Trackers transmit persistent identifiers, including the Google Analytics client identifier stored in the _ga cookie (transmitted as the "cid" or "gacid" parameter) and the Google Ads conversion-linker identifier stored in the _gcl_au cookie (transmitted as the "auid" parameter). Where the user is signed into a

Google account, the requests to Google's domains also carry the user's logged-in Google account cookies, including __Secure-3PSID, __Secure-3PAPISID, and NID. Those identifiers enable Google to recognize and link activity associated with the same browser, device, or account across interactions and contexts, and, where the user is signed in, to associate the transmitted activity with that user's authenticated Google account.

34. StackAdapt is a programmatic advertising company headquartered in Toronto, Canada. StackAdapt operates a demand-side advertising platform that enables advertisers to build audiences, retarget website visitors across the internet, and attribute conversions to advertising campaigns. Mount Sinai has implemented StackAdapt's tracking pixel on its Website. When a user loads a page carrying the pixel, information about the user's activity is transmitted to StackAdapt through requests to tags.srv.stackadapt.com, including "saq_pxl" page-view requests, recurring "js_tracking" requests, and "conv" conversion requests, together with StackAdapt's persistent browser identifiers (transmitted as the "sa-user-id," "sa-user-id-v2," "sa-user-id-v3," and "sa-user-id-v4" parameters). Those identifiers allow StackAdapt to recognize the same browser across websites for advertising purposes.

35. Each of the Third-Party Recipients' privacy disclosures confirms that it uses the data it collects to advertise and market to users, including by targeting advertising and combining data collected from different contexts to build unified profiles. For these recipients, a visitor's pursuit of a particular physician or medical specialty is not incidental to some service performed for Mount Sinai; it is the advertising signal itself.

36. The Website also loads call-tracking technology operated by CallRail, Inc. ("CallRail"), a marketing-attribution company headquartered in Atlanta, Georgia. As documented in the capture described in Section E below, when a physician profile page loads, CallRail's

technology transmits to CallRail the address of the profile page, the address of the page from which the visitor arrived, the visitor's Google Analytics identifier, and a CallRail visitor identifier. The full extent of CallRail's receipt and use of visitors' communications is a subject for discovery.

### D. Mount Sinai Discloses Visitors' Physician and Specialty Communications to Third Parties

37. When a visitor loads a page on the Website, the visitor's browser sends an HTTP request to the Website's server. In response, the server returns the webpage, which contains small pieces of code known as trackers, tags, or pixels. That code instructs the browser to send the visitor's interactions—along with identifying data such as cookies, browser details, and device information—to the Third-Party Recipients, in real time and in parallel with the visitor's communications with Mount Sinai.

38. Plaintiffs' counsel's pre-suit investigation, conducted using the Chrome DevTools Network panel and the corresponding HAR (HTTP Archive) files, documented these transmissions on the Website's "Find a Doctor" and "Explore Medical Care" paths. As the visitor navigated the Website, each page view fired a Google Analytics "page_view" event and a parallel StackAdapt tracking request, each carrying the content of the page in plain text.

39. For example, when the visitor used "Find a Doctor" to open the profile of a Mount Sinai cardiologist, the Google Analytics request transmitted the profile's address (the "dl," or document location, parameter, in the form www.msmc.com/doctor/[physician-name]/), the page title naming the physician (the "dt," or document title, parameter), and the page from which the visitor arrived (the "dr," or document referrer, parameter, www.msmc.com/find-a-doctor/), together with the visitor's persistent Google Analytics client identifier, which remained constant across the visitor's navigation. StackAdapt received the same profile address and physician title

(as the "landing_url" and "t" parameters), together with the visitor's persistent StackAdapt identifiers.

40. Likewise, when the visitor used "Explore Medical Care" to open the Website's Urology service page, Google Analytics received dl=www.msmc.com/urology/, dr=www.msmc.com/explore-medical-care/, and dt="Mount Sinai Urology Services, Miami," with the same persistent client identifier, and StackAdapt received the same page address and title with the same StackAdapt identifiers.

41. The investigation further documented that the Google Analytics requests were sent cross-site from the Website (Origin: https://www.msmc.com) to a Google domain, and that the request headers carried the visitor's logged-in Google account cookies, including __Secure-3PSID, __Secure-3PAPISID, and NID. Each page view was therefore transmitted to Google together with credentials that identify the specific Google account holder, allowing Google to link the physician and specialty the visitor was seeking to that visitor's Google identity.

42. Through these transmissions, the Third-Party Recipients learn not merely that a visitor accessed the Website, but the specific physician the visitor sought, that physician's specialty, the clinical service the visitor was researching, and the navigation path by which the visitor arrived there.

**E. A Demonstrative Capture Confirms That the Transmissions Continue Today**

43. To illustrate how the Trackers operate, on September 22, 2026, Plaintiff Ptalis recorded a navigation session on the Website using the Google Chrome browser with the Chrome DevTools Network panel open, and exported the corresponding HAR file. The recording is offered to demonstrate the Website's functionality and the manner in which the Trackers transmit visitors' communications. It is not offered as a record of any specific prior visit by either Plaintiff, and

Plaintiffs' claims do not rest on it. It confirms that the conduct described above is ongoing and operates in the same manner today. The figures that follow are drawn from that recording and HAR file.

44. The session began on the Website's homepage. The user typed "asthma" into the Website's search function, which returned a Mount Sinai pulmonologist and the Website's "Asthma" and "Pulmonary" medical-care pages, as shown in Figure 1.



*Figure 1: The user searches the Website for "asthma." The results identify a Mount Sinai pulmonologist and the "Asthma" and "Pulmonary" medical-care pages.*

45. The user opened the Website's Pulmonary service page, www.msmc.com/pulmonary/ ("Advanced Pulmonary Care"), shown in Figure 2, and from that page searched for and opened the profile of a Mount Sinai physician whose profile identifies his specialty as "Pulmonary • Critical Care" (the "Pulmonary Physician"), shown in Figure 3.




*Figure 2: The Website's Pulmonary service page, www.msmc.com/pulmonary/.*




*Figure 3: The Pulmonary Physician's profile page, identifying his specialty as "Pulmonary • Critical Care," with the DevTools Network panel (right) showing the StackAdapt "saq_pxl" request fired on page load.*

46. Within approximately one and one-half seconds of the profile page loading, the Website caused the user's browser to transmit a Google Analytics "page_view" event to analytics.google.com. As shown in Figure 4, the request carried the profile's address (dl=https://www.msmc.com/doctor/ari-j-ciment/), the page title naming the physician (dt="Dr. Ari

J Ciment, MD - Mount Sinai Medical Center"), the referring Pulmonary service page (dr=https://www.msmc.com/pulmonary/), Mount Sinai's measurement ID (tid=G-GHZ22ZN8WN), and the user's persistent Google Analytics client identifier (cid=138353930.1790086484). The request was sent cross-site from Origin https://www.msmc.com.

```
Request URL                      https://analytics.google.com/g/collect
Request Method                   POST
Status Code                      204
origin                           https://www.msmc.com
referer                          https://www.msmc.com/
sec-fetch-site                   cross-site

Query String Parameters
v                                2
tid                              G-GHZ22ZN8WN
cid                              138353930.1790086484
dl                               https://www.msmc.com/doctor/ari-j-ciment/
dr                               https://www.msmc.com/pulmonary/
dt                               Dr. Ari J Ciment, MD - Mount Sinai Medical Center
en                               page_view
```

*Figure 4: The Google Analytics "page_view" request for the Pulmonary Physician's profile, transmitting the profile address (dl), the physician's name in the page title (dt), the referring Pulmonary page (dr), and the persistent client identifier (cid).*

47. In the same instant, the Website caused the browser to send a parallel "page_view" request to Google's advertising infrastructure at www.google.com/ccm/collect, shown in Figure 5, carrying the same profile address, physician title, and Pulmonary referrer, together with the user's Google Ads identifier (auid=1957294613.1790086484). Google therefore received the user's pursuit of a pulmonary and critical-care physician not only for analytics, but through its advertising systems.

| | |
|---|---|
| Request URL | https://www.google.com/ccm/collect |
| Request Method | POST |
| Status Code | 200 |
| referer | https://www.msmc.com/ |
| **Query String Parameters** | |
| auid | 1957294613.1790086484 |
| dt | Dr. Ari J Ciment, MD - Mount Sinai Medical Center |
| en | page_view |
| dl | https://www.msmc.com/doctor/ari-j-ciment/ |
| dr | https://www.msmc.com/pulmonary/ |

*Figure 5: The parallel request to Google's advertising endpoint (www.google.com/ccm/collect), carrying the same physician and specialty information together with the Google Ads identifier (auid).*

48. Also within the same second, the Website caused the browser to transmit a "saq_pxl" request to StackAdapt, shown in Figure 6, carrying the profile address (landing_url=https://www.msmc.com/doctor/ari-j-ciment/) and the physician title (t="Dr. Ari J Ciment, MD - Mount Sinai Medical Center"), together with the user's persistent StackAdapt identifiers (sa-user-id, sa-user-id-v2, sa-user-id-v3, and sa-user-id-v4). StackAdapt's pixel then continued to report the profile address to StackAdapt in recurring "js_tracking" requests while the user remained on the page.

| | |
|---|---|
| Request URL | https://tags.srv.stackadapt.com/saq_pxl |
| Request Method | GET |
| Status Code | 200 |
| origin | https://www.msmc.com |
| referer | https://www.msmc.com/ |
| sec-fetch-site | cross-site |
| **Query String Parameters** | |
| uid | XDbR9bgzYgamKCe5q8YQuw |
| landing_url | https://www.msmc.com/doctor/ari-j-ciment/ |
| t | Dr. Ari J Ciment, MD - Mount Sinai Medical Center |
| host | https://www.msmc.com |
| sa-user-id-v4 | s:CiQwMTlmMzI3NC0yNWEyLTdiYjgtODU2OS03MDNkZm… |
| sa-user-id-v3 | s:AQAKIB8aCooT-FRkonXYCU0NqFZuVCBX7yQxSf7gtm… |
| sa-user-id-v2 | s:H_A5VDxtWR1ngz3hSaX9QUVUaMc.eV0hexbK7Kfsn7… |
| sa-user-id | s:0-1ff03954-3c6d-591d-6783-3de149a5fd41.b4v… |

*Figure 6: The StackAdapt "saq_pxl" request, transmitting the Pulmonary Physician's profile address (landing_url) and name (t) together with StackAdapt's persistent user identifiers (values truncated).*

49. When the user clicked "Schedule with" the Pulmonary Physician, the Website caused the browser to transmit a custom Google Analytics event named "Click Schedule Online

Physician," shown in Figure 7, carrying the same profile address, physician title, Pulmonary referrer, and client identifier. Simultaneously, the Website reported the same click to Google's advertising-conversion endpoint, www.google.com/measurement/conversion, shown in Figure 8, carrying the profile address (url), the Pulmonary referrer (ref), the physician title (tiba), the Google Analytics client identifier (gacid), and the Google Ads identifier (auid).

| | |
|---|---|
| Request URL | https://analytics.google.com/g/collect |
| Request Method | POST |
| Status Code | 204 |
| origin | https://www.msmc.com |
| referer | https://www.msmc.com/ |
| sec-fetch-site | cross-site |
| Query String Parameters | |
| tid | G-GHZ22ZN8WN |
| cid | 138353930.1790086484 |
| dl | https://www.msmc.com/doctor/ari-j-ciment/ |
| dr | https://www.msmc.com/pulmonary/ |
| dt | Dr. Ari J Ciment, MD - Mount Sinai Medical Center |
| en | Click Schedule Online Physician |

*Figure 7: The Google Analytics "Click Schedule Online Physician" event, reporting that the user began scheduling with the Pulmonary Physician.*

| | |
|---|---|
| Request URL | https://www.google.com/measurement/conversion |
| Request Method | POST |
| Status Code | 200 |
| referer | https://www.msmc.com/ |
| Query String Parameters | |
| tid | G-GHZ22ZN8WN |
| en | Click Schedule Online Physician |
| url | https://www.msmc.com/doctor/ari-j-ciment/ |
| ref | https://www.msmc.com/pulmonary/ |
| gacid | 138353930.1790086484 |
| tiba | Dr. Ari J Ciment, MD - Mount Sinai Medical Center |
| auid | 1957294613.1790086484 |

*Figure 8: The same scheduling click reported to Google's advertising-conversion endpoint (www.google.com/measurement/conversion), with the physician's profile (url), the Pulmonary referrer (ref), the physician's name (tiba), and both Google identifiers (gacid and auid).*

50. The Website then presented the prompt shown in Figure 9: "Have you been seen by a Mount Sinai doctor with this specialty in the last three years?" The user selected "Yes, I'm an existing patient" and clicked "Submit."




*Figure 9: The Website's patient-status prompt, presented after the user clicked to schedule with the Pulmonary Physician.*

51. Upon submission, the Website caused the browser to transmit a custom Google Analytics event named "mcc_make_an_appointment_form_submit," shown in Figure 10, carrying the Pulmonary Physician's profile address, his name in the page title, the Pulmonary referrer, and the user's client identifier. In the same millisecond, the Website fired StackAdapt's conversion pixel (tags.srv.stackadapt.com/conv), reporting the completed appointment-form submission to StackAdapt as an advertising conversion. The Website then displayed "Schedule Your Follow-Up with MyChart," directing the user, as an existing patient, to Mount Sinai's patient portal.

| | |
|---|---|
| Request URL | https://analytics.google.com/g/collect |
| Request Method | POST |
| Status Code | 204 |
| origin | https://www.msmc.com |
| referer | https://www.msmc.com/ |
| sec-fetch-site | cross-site |
| Query String Parameters | |
| tid | G-GHZ22ZN8WN |
| cid | 138353930.1790086484 |
| dl | https://www.msmc.com/doctor/ari-j-ciment/ |
| dr | https://www.msmc.com/pulmonary/ |
| dt | Dr. Ari J Ciment, MD - Mount Sinai Medical Center |
| en | mcc_make_an_appointment_form_submit |

*Figure 10: The Google Analytics "mcc_make_an_appointment_form_submit" event, reporting that the user submitted the appointment form from the Pulmonary Physician's profile.*

52. In the course of a single, roughly forty-second visit, therefore, Google and StackAdapt each learned that a browser they could persistently recognize—and, in Google's case, could link to its Google advertising identifier and, where the user is signed in, to a Google account—had navigated from the Website's Pulmonary service page to the profile of a specific pulmonary and critical-care physician, had begun scheduling with that physician, and had submitted the Website's appointment form. Those are the steps of a patient seeking care from a specific physician for a specific kind of medical problem.

53. The same capture shows that the Website also transmitted the Pulmonary Physician's profile address and the Pulmonary referrer to CallRail, together with the user's Google Analytics identifier and a CallRail visitor identifier.

54.The Website displayed a cookie notice, but the Trackers transmitted the communications described above within milliseconds of the notice loading, before the user could read or respond to it. The notice requested no consent: it offered only an "I understand" button, enabled all tracking by default, and described cookies as used for "functional and analytics purposes," without disclosing any transmission to advertising platforms.

**F. Visitors' Browsing Activity Across the Website**

55. The interception of visitors' electronic communications is not limited to the interactions described above. Every physician profile and clinical service page a visitor requests on the Website—including pages identifying physicians by specialty and pages describing specific conditions and services—is transmitted to the Third-Party Recipients in real time, together with their respective persistent identifiers. Through these transmissions, the Third-Party Recipients learn not only that the visitor accessed the Website, but the specific physicians, specialties, conditions, and services the visitor was pursuing.

56. This Complaint focuses on the Third-Party Recipients identified above because those are the tracking systems documented here. Discovery may reveal additional third-party recipients or additional tracking products deployed on the Website.

**G. Defendant's Responsibility for the Interception of Electronic Communications**

57. Although the Trackers perform the technical acquisition and transmission functions, Mount Sinai is legally responsible under the FSCA and the ECPA because it intentionally procured, enabled, directed, authorized, and caused the Third-Party Recipients to acquire the challenged communications.

58. Mount Sinai knowingly made the affirmative decision to implement the Trackers on www.msmc.com. That implementation was deliberate and required Mount Sinai, or persons acting on its behalf, to configure and deploy the code through Mount Sinai's own Google Tag Manager containers and Google Analytics property.

59. The tracking here is not merely a generic page-view tag. The events "Click Schedule Online Physician" and "mcc_make_an_appointment_form_submit" are not Google defaults; they are custom events that Mount Sinai, or persons acting on its behalf, named,

configured, and wired to fire when a visitor takes steps to schedule care with a specific physician. Mount Sinai likewise configured those scheduling actions to be reported as advertising conversions to Google's conversion-measurement endpoint and to StackAdapt's conversion pixel. Configuring a patient's scheduling actions as advertising conversions is an engineering and marketing decision, not an incident of ordinary website operation.

60. Mount Sinai controls, participates in controlling, or has the contractual and practical ability to control which pages and events on its Website trigger tracking. At minimum, Mount Sinai could elect not to procure tracking on its physician profiles, its clinical service pages, its search function, and its scheduling flow—yet the captured requests show tracking operating on precisely those functions.

61. Without Mount Sinai's implementation and continued operation of this code, the Third-Party Recipients would not have acquired the communications at issue.

### H. Mount Sinai's Privacy Disclosures Do Not Authorize the Tracking Conduct

62. The Website does not present any Terms of Use or Terms of Service, and it contains no arbitration provision or class-action waiver governing a visitor's use of the Website. Visitors are not required to affirmatively agree to anything before searching for physicians, opening physician profiles or service pages, clicking to schedule, or answering the Website's patient-status prompt.

63. Mount Sinai's Privacy Policy is linked from the Website's footer and from its cookie notice, but visitors have no occasion to read it before their communications have already been transmitted. It is a passive browsewrap document that no visitor is asked to accept. Browsewrap terms bind a user only where the hyperlink to them is conspicuous enough to put a

reasonably prudent person on inquiry notice before engaging with the website. Mount Sinai's links fail that test.

64. Even if it were enforceable, the Privacy Policy does not disclose, and cannot constitute consent to, the conduct alleged here. It states only in general terms that Mount Sinai and its "vendors" use "pixels, cookies, or similar tools" to collect device details and "activity on our website," and that Mount Sinai shares data with "analytics vendors" to understand how visitors interact with the Website. It does not name Google or StackAdapt. It does not disclose that the address and title of the physician profile and service pages a visitor requests—which identify the specific physician and medical specialty the visitor is seeking—are transmitted in real time to Google's advertising systems and to an advertising platform, keyed to persistent advertising identifiers and to the visitor's logged-in Google account. And it does not disclose that a patient's steps to schedule care with a specific physician are reported to those companies as advertising conversions.

65. The Privacy Policy further states at the outset that it does not apply to protected health information, directing readers instead to a separate HIPAA notice. The Privacy Policy thereby treats a patient's search for, and scheduling with, his or her own physician as ordinary "website activity" rather than as the health information it is, and it discloses nothing about the transmissions documented above.

66. Consent is limited to the specific conduct authorized. A reasonable person would not understand a generic, footer-linked privacy policy—one that disclaims application to protected health information—to authorize the real-time transmission of the physician and specialty he or she is seeking, and of his or her scheduling actions with that physician, to advertising and analytics companies, joined to identifiers by which those companies recognize him or her.

## I. Mount Sinai's Conduct Violates HIPAA

67. Mount Sinai is a covered entity under HIPAA within the meaning of 45 C.F.R. § 160.103. It is a health care provider that furnishes, and bills for, health care through its hospital and its physician practices, and it transmits health information electronically in connection with covered transactions. As a covered entity, Mount Sinai is subject to HIPAA's prohibitions on the unauthorized use and disclosure of protected health information ("PHI"), 45 C.F.R. § 164.502(a), and to the Privacy Rule's requirement of a written authorization for any use or disclosure of PHI for marketing, 45 C.F.R. § 164.508(a)(3). Mount Sinai publishes a separate HIPAA notice on its Website reflecting its recognition of those obligations.

68. PHI is defined as "individually identifiable health information" that is (i) transmitted by electronic media; (ii) maintained in electronic media; or (iii) transmitted or maintained in any other form or medium. 45 C.F.R. § 160.103. Individually identifiable health information ("IIHI") is health information that (1) is created or received by a health care provider, health plan, employer, or health care clearinghouse; (2) relates to an individual's past, present, or future physical or mental health or condition, or to the provision of or payment for health care; and (3) either identifies the individual or provides a reasonable basis to believe the individual can be identified. Id.

69. The information at issue satisfies the first two prongs. It is received by Mount Sinai, a health care provider, through its own Website. And when a patient searches for a Mount Sinai specialist, opens the profile of the physician who treats or will treat him or her, clicks to schedule with that physician, and submits the Website's appointment form, the patient discloses information relating to his or her physical or mental health or condition and to the provision of health care to him or her by Mount Sinai. That is especially so for Plaintiffs and other Class Members who are

existing Mount Sinai patients, whose Website communications concern the physicians and specialties from which they receive care.

70. The identifiers transmitted alongside those communications satisfy the third prong. HIPAA's de-identification provision treats a "unique identifying number, characteristic, or code" as an identifier that must be removed for information to qualify for the regulatory safe harbor. 45 C.F.R. § 164.514(b)(2)(i). The Google Analytics client identifier, the Google Ads identifier, the logged-in Google account cookies, and the StackAdapt identifiers described above are persistent codes capable of linking the same browser, device, account, or user across interactions. Transmitted in the same requests as the physician, specialty, and scheduling information—and combined with information available to the recipient—those identifiers provide a reasonable basis to believe the individual can be identified. The allegation is especially concrete where, as with Plaintiffs, the visitor was signed into a Google account, because the Google account cookies link the communication to the visitor's authenticated Google identity. *See Kane v. Univ. of Rochester*, 2024 WL 1178340 (W.D.N.Y. Mar. 19, 2024).

71. The health-related information intercepted from the Website is highly sensitive. It reveals the specific physicians and specialists patients are seeking—including pulmonologists, gastroenterologists, psychiatrists, cardiologists, and urologists—and thus the categories of illness from which they suffer. The disclosure of this information to advertising and analytics companies exposes patients to privacy invasions and to the risk of stigma, discrimination, and targeted exploitation.

72. HIPAA criminalizes the knowing disclosure of individually identifiable health information in violation of HIPAA, with enhanced penalties where the offense is committed with intent to sell, transfer, or use the information for commercial advantage, personal gain, or

malicious harm. 42 U.S.C. § 1320d-6. Mount Sinai did not deploy or procure the Trackers merely for passive website maintenance. It selected and used them to obtain advertising, analytics, conversion-measurement, retargeting, and audience-building benefits by transmitting patients' physician, specialty, and scheduling communications to third parties—including by configuring patients' scheduling actions as advertising conversions to Google's conversion-measurement endpoint and StackAdapt. Those facts support the inference that a purpose of the challenged interception was to disclose and use individually identifiable health information for commercial advantage, and that the HIPAA offense was independent of the interception prohibited by the ECPA.

73. Mount Sinai did not obtain HIPAA-compliant authorizations from visitors for these disclosures. To the extent Mount Sinai contends that any Third-Party Recipient acted as its business associate for any challenged tracking function, the existence, scope, and terms of any business associate agreement are facts particularly within Mount Sinai's and that recipient's possession. On information and belief, no agreement or other arrangement authorized the Third-Party Recipients to receive and use the challenged information for their own advertising, profiling, retargeting, or other independent commercial purposes, and a business associate agreement would not itself authorize uses or disclosures outside HIPAA's permitted scope.

74. Mount Sinai had actual and constructive knowledge that its deployment of third-party trackers on its Website transmitted PHI to third parties in violation of HIPAA. In December 2022, and as updated in March 2024, the U.S. Department of Health and Human Services, Office for Civil Rights, issued guidance warning HIPAA-covered entities that the use of third-party tracking technologies on their websites—including pixels and analytics tools—that transmit PHI to third-party vendors without a HIPAA-compliant authorization or business associate agreement

constitutes an impermissible disclosure. Mount Sinai, which publishes its own HIPAA notice and holds itself out as handling health information subject to HIPAA, cannot credibly claim ignorance of that well-publicized guidance. Its continued deployment of the Trackers reflects a knowing and deliberate choice to prioritize advertising and analytics benefits over its legal obligations.

75. The alleged interceptions do not depend on the transmission of IP addresses or generic analytics alone. The captured requests transmit the actual substance of visitors' communications—the physicians and specialties they sought and their scheduling actions with those physicians—together with persistent identifiers capable of linking those communications to the same browser, device, account, or user.

### J. Plaintiffs' Specific Experiences

***Plaintiff Amy Ptalis***

76. Plaintiff Amy Ptalis is a Florida resident who lives in Miami Beach, Miami-Dade County, Florida. She is a Mount Sinai patient and has received care from a Mount Sinai pulmonologist—the Pulmonary Physician whose profile appears in Figures 3 through 10.

77. After July 2024, within the applicable limitations period, and on more than one occasion, Plaintiff Ptalis visited the Website while physically located in Florida to locate and view the profiles of multiple Mount Sinai physicians from whom she sought care from several practice areas relevant to her healthcare needs, including pulmonology, gynecology, and psychiatry.

78. Plaintiff Ptalis accessed the Website from her personal Apple MacBook computers using the Google Chrome browser, and from her Apple iPhone using the Safari browser. She did not use an ad blocker or a private or "incognito" browsing mode, meaning the Trackers embedded on the Website were fully operational during her visits. When she used the Website on Chrome, she was ordinarily signed into her Google (Gmail) account.

79. Before interacting with the Website, Plaintiff Ptalis was not asked to agree to any Terms of Use, clickwrap, or other affirmative request for permission to disclose her communications with Mount Sinai to the Third-Party Recipients.

80. In the same manner documented above in Section D and in Figures 1 through 10, the address and title of each physician profile and service page Plaintiff Ptalis requested—identifying the physician she sought and that physician's specialty—were intercepted in real time and transmitted to Google and StackAdapt, together with her persistent Google Analytics, Google Ads, and StackAdapt identifiers. Because she was signed into her Google account when using Chrome, the Google account cookies transmitted alongside those communications linked them to her authenticated Google identity.

***Plaintiff Stefanie L. Malvin***

81. Plaintiff Stefanie L. Malvin is a Florida resident who lives in Miami Beach, Miami-Dade County, Florida. She is a Mount Sinai patient.

82. Plaintiff Malvin has used the Website regularly over a period of years, including on more than one occasion after July 2024, within the applicable limitations period, while physically located in Florida. During those visits, Plaintiff Malvin searched the Website for a gastroenterologist and for a psychiatrist, and opened the profile pages of Mount Sinai physicians in those specialties.

83. Plaintiff Malvin accessed the Website from her Samsung mobile phone using the Google Chrome browser. She did not use an ad blocker, a virtual private network, or a private or "incognito" browsing mode, meaning the Trackers embedded on the Website were fully operational during her visits. She is always signed into her Google account on that device, and was signed in during her visits to the Website.

84. Before interacting with the Website, Plaintiff Malvin was not asked to agree to any Terms of Use, clickwrap, or other affirmative request for permission to disclose her communications with Mount Sinai to the Third-Party Recipients.

85. In the same manner documented above in Section D and in Figures 1 through 10, the address and title of each gastroenterology and psychiatry physician profile Plaintiff Malvin requested—identifying the physician she sought and that physician's specialty—were intercepted in real time and transmitted to Google and StackAdapt, together with her persistent Google Analytics, Google Ads, and StackAdapt identifiers. Because she was signed into her Google account, the Google account cookies transmitted alongside those communications linked them to her authenticated Google identity.

***Both Plaintiffs***

86. Because Mount Sinai deployed the Trackers on its Website, the Third-Party Recipients intercepted and received Plaintiffs' sensitive health-related communications without their knowledge or consent. At no time did either Plaintiff consent to the interception of her communications with Mount Sinai through the Website by the Third-Party Recipients, or to Mount Sinai enabling those companies to access or intercept such information. Each Plaintiff reasonably expected that her communications with her own hospital about the physicians and care she sought were solely between herself and Mount Sinai and would not be transmitted or disclosed to advertising and analytics companies.

87. Had Plaintiffs known that the physicians and specialties they sought on the Website would be transmitted in real time to advertising and analytics companies and linked to their Google accounts and advertising identifiers, they would not have used the Website in the manner they did. Plaintiffs' information remains in the possession of the Third-Party Recipients. On information and belief, Mount Sinai continues to deploy the Trackers in the same manner, as the demonstrative

capture described in Section E confirms. Plaintiffs remain Mount Sinai patients and would continue to use the Website to locate physicians and schedule care were it not intercepting and disclosing their communications in the manner alleged.

## INJURY TO PLAINTIFFS AND CLASS MEMBERS

88. Mount Sinai's procurement of the unauthorized interception of Website visitors' communications has caused actual harm to Plaintiffs and Class Members in multiple ways.

89. **Invasion of Privacy.** The information disclosed—the specific physicians and specialists visitors sought, the clinical services they researched, and their steps to schedule care—is among the most private information an individual possesses. Its interception and disclosure to advertising and analytics companies, joined to identifiers capable of identifying the individual, can result in significant embarrassment, stigma, and discrimination. Plaintiffs and Class Members have suffered an invasion of privacy through the unauthorized interception of their electronic communications, violating their reasonable expectation that their communications with their hospital would remain private.

90. **Commercial Exploitation and Loss of Control.** Mount Sinai caused Plaintiffs' and Class Members' sensitive communications to be disclosed to advertising and analytics recipients and used the resulting data flows to obtain advertising, measurement, conversion-attribution, audience-building, and patient-acquisition benefits. Plaintiffs and Class Members thereby lost control over information they had communicated for the limited purpose of locating and obtaining care from Mount Sinai physicians. Personal data—especially health-related information—has significant commercial value, as demonstrated by Mount Sinai's own use of that data for advertising and conversion measurement.

91. **Diminished Confidence in Healthcare Privacy.** The unauthorized interception of Plaintiffs' and Class Members' communications has undermined their ability to freely and confidentially locate physicians, research care, and schedule appointments with their own hospital without fear that their activities are being intercepted by third parties.

92. **Risk of Further Use of Intercepted Data.** Once intercepted by the Third-Party Recipients, Plaintiffs' and Class Members' data is beyond their control and may be further processed, combined with other data, and used for advertising and profiling purposes. By receiving information revealing that a particular user sought a pulmonologist, a gastroenterologist, a psychiatrist, or another specialist, an advertising platform can associate that health-related interest with the user or the user's profile and use it to deliver targeted advertising over time.

93. **Statutory Injury.** Independent of the above harms, Mount Sinai's violations of the FSCA and the ECPA have caused Plaintiffs and Class Members to suffer statutory injury, entitling them to the remedies provided by law, including statutory damages.

## CLASS ACTION ALLEGATIONS

94. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

95. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the United States who, within the applicable statute of limitations period, visited a physician profile page or medical-care service page on Mount Sinai's Website (www.msmc.com) and whose electronic communications were intercepted by one or more third-party tracking technologies deployed by Mount Sinai (the "Nationwide Class").

96. The Florida Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in Florida who, within the applicable statute of limitations period, visited a physician profile page or medical-care service page on Mount Sinai's Website (www.msmc.com) and

> whose electronic communications were intercepted by one or more third-party tracking technologies deployed by Mount Sinai (the "Florida Class").

97. Together, the Nationwide Class and the Florida Class are referred to as the "Class."

98. Excluded from the Class are: (a) Defendant, its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (b) the Third-Party Recipients and CallRail, and their officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (c) any governmental entities; (d) the judge(s) to whom this case is assigned, their immediate family members and staff, and the attorneys for the parties and their staff; and (e) any jurors assigned to this case.

99. Plaintiffs reserve the right to modify, change, or expand the Class definitions based upon discovery and further investigation.

100. **Numerosity.** The Class is so numerous that joinder of all members is impracticable. The Website receives approximately 425,000 visits per month, approximately 86% of them from the United States—on the order of 370,000 U.S. visits per month and 4.4 million U.S. visits per year. "Find a Doctor" and "Explore Medical Care" are two of the Website's three primary navigation items, and a substantial share of those visits include a physician profile or medical-care service page. Because Mount Sinai serves patients principally in Miami-Dade and Monroe Counties, a substantial majority of those visitors reside in Florida. The number of individuals whose communications were intercepted by the Trackers during the relevant period is estimated to be in the hundreds of thousands. The precise number and identities of Class Members are within Defendant's and the Third-Party Recipients' records.

101. **Ascertainability.** The Class is ascertainable because its members can be identified through objective criteria using records maintained by Defendant and third parties. Mount Sinai's web-server logs, its Google Analytics account data and any linked Google advertising accounts

, its StackAdapt account data, and its patient and scheduling records contain records of visitors to the Website whose electronic communications were intercepted by the Trackers during the applicable limitations period, including IP addresses, cookie identifiers, timestamps, and the specific pages and events involved.

102. **Commonality and Predominance.** There are questions of law and fact common to the Class that predominate over any questions affecting only individual members. These common questions include:

(a) Whether Mount Sinai implemented the Trackers on its Website;

(b) Whether the Trackers intercepted the contents of Website visitors' electronic communications;

(c) Whether Mount Sinai procured, enabled, directed, authorized, or caused the Third-Party Recipients to intercept Website visitors' electronic communications;

(d) Whether Mount Sinai obtained Website visitors' consent to the interception of their electronic communications;

(e) Whether Mount Sinai's conduct violated Fla. Stat. § 934.03;

(f) Whether Mount Sinai's conduct violated 18 U.S.C. § 2511;

(g) Whether Mount Sinai breached a duty of confidence owed to Plaintiffs and Class Members;

(h) Whether Mount Sinai has been unjustly enriched through its conduct;

(i) Whether Mount Sinai's conduct constituted an unfair or deceptive act or practice within the meaning of Fla. Stat. § 501.204;

(j) Whether Plaintiffs and Class Members are entitled to damages and other monetary relief, and if so, in what amount; and

(k) Whether Plaintiffs and Class Members are entitled to equitable relief, including declaratory and injunctive relief.

103. These common questions predominate over individualized issues because Plaintiffs challenge a centralized course of conduct: Mount Sinai's deployment of the same tracking code, through the same Google Tag Manager containers, across the same physician profiles, service pages, and scheduling flow, governed by the same absence of any consent mechanism and the same Privacy Policy. Liability can be addressed through common technical and documentary proof concerning the code and configurations used, the categories of contents transmitted, the recipients and identifiers involved, Mount Sinai's role in procuring the transmissions, and the disclosures presented to visitors.

104. Individualized questions—such as which particular pages a given Class Member visited or the precise dates of his or her visits—do not predominate, and in any event are answerable from Defendant's and the Third-Party Recipients' records.

105. **Typicality.** Plaintiffs' claims are typical of the claims of the other Class Members. Plaintiffs and Class Members all visited physician profile or medical-care service pages on the Website and had the contents of their electronic communications intercepted by the Third-Party Recipients without their consent, arising from the same practices and course of conduct and based on the same legal theories.

106. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests adverse or antagonistic to those of the Class, and have retained counsel experienced in complex class action litigation, including class actions involving privacy violations,

unlawful data collection, and the interception of electronic communications in the healthcare context. Plaintiffs' counsel have the resources, expertise, and commitment to prosecute this action vigorously through discovery, class certification, trial, and any appeals.

107. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by many Class Members may be relatively small compared to the burden and expense of individual litigation, making it difficult for Class Members to individually redress the wrongs done to them. Prosecution of separate actions would create a risk of inconsistent or varying adjudications. A class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

108. **Injunctive and Declaratory Relief.** Mount Sinai has acted or refused to act on grounds generally applicable to the Class as a whole, making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole under Rule 23(b)(2). Mount Sinai's conduct is ongoing.

109. **Issue Certification.** Alternatively, Plaintiffs seek certification of the common issues identified above under Rule 23(c)(4). Certification of those issues would materially advance the litigation, promote uniform adjudication of Defendant's common conduct, and narrow any individualized questions that may remain after the class-wide issues are resolved.

## CAUSES OF ACTION

### COUNT I
### Violation of the Florida Security of Communications Act
### (Fla. Stat. § 934.03)
### (On Behalf of Plaintiffs and the Florida Class)

110. Plaintiffs incorporate paragraphs 1–109 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Florida Class.

111. The FSCA prohibits intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any electronic communication. Fla. Stat. § 934.03(1)(a). The FSCA is an all-party consent statute, requiring the consent of all parties to the communication. Fla. Stat. § 934.03(2)(d).

112. The FSCA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3). It defines "contents" as "any information concerning the substance, purport, or meaning of that communication." Fla. Stat. § 934.02(7). The FSCA was "designed to protect precisely the information at issue in this case—private medical information." W.W. v. Orlando Health, Inc., 2025 WL 722892, at *4 (M.D. Fla. Mar. 6, 2025).

113. The Trackers deployed on Mount Sinai's Website constitute "electronic, mechanical, or other device[s]" within the meaning of the FSCA. Unlike session-replay technology that merely records mouse movements, the Trackers here actively acquire and transmit the contents of visitors' communications, including the physicians and specialties they seek and their scheduling actions with those physicians.

114. The transmissions between Plaintiffs and Class Members and Mount Sinai's Website constitute "electronic communications" within the meaning of the FSCA because they are transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system. Fla. Stat. § 934.02(12).

115. The Trackers intercept the "contents" of Plaintiffs' and Class Members' electronic communications, not merely routing or addressing information. The addresses and titles of the physician profiles and service pages a visitor requests identify the specific physician and medical

specialty the visitor is seeking, and the scheduling events identify the visitor's steps to obtain care from that physician; they therefore concern the "substance, purport, or meaning" of the visitor's communication within the meaning of Fla. Stat. § 934.02(7). *See W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *4–5 (holding that URLs reflecting medical services sought constitute "contents" under the FSCA); *Goldstein v. Costco Wholesale Corp.*, 559 F. Supp. 3d 1318, 1321 (S.D. Fla. 2021) (URLs may constitute "contents" where they reveal substantive information about a user's activity). Mount Sinai's conduct is readily distinguishable from the collection of "basic analytic data" in a "generic commercial setting" at issue in *Jacome v. Spirit Airlines, Inc.*, 2021 WL 3087860 (Fla. Cir. Ct. June 17, 2021), because the data intercepted here is confidential, health-related information that the FSCA was enacted to protect.

116. The interception is contemporaneous with transmission. The Trackers acquire each communication in the instant it is made—within fractions of a second of the page request or click—and transmit it from the visitor's browser to the Third-Party Recipients in real time.

117. Mount Sinai intentionally procured the Third-Party Recipients to intercept these electronic communications by deliberately implementing the Trackers on its Website and by configuring custom events that report visitors' scheduling actions to them. Plaintiffs and Class Members did not consent to this interception, and the FSCA requires the consent of all parties.

118. As a direct result of Mount Sinai's violations, Plaintiffs and Class Members are entitled to: (a) actual damages, or liquidated damages computed at the higher of $100 per day for each day of violation or $1,000; (b) punitive damages; and (c) reasonable attorneys' fees and other litigation costs reasonably incurred. Fla. Stat. § 934.10(1).

119. Plaintiffs and Class Members are also entitled to preliminary and other equitable or declaratory relief as appropriate, Fla. Stat. § 934.10(1)(a), including an injunction preventing

Mount Sinai from continuing to deploy the Trackers to intercept their electronic communications without the consent of all parties.

**COUNT II**
**Violation of the Electronic Communications Privacy Act**
**(18 U.S.C. § 2511, et seq.)**
**(On Behalf of Plaintiffs and the Nationwide Class)**

120. Plaintiffs incorporate paragraphs 1–109 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Nationwide Class.

121. The ECPA prohibits the intentional interception of electronic communications and the procuring of any other person to intercept electronic communications. 18 U.S.C. § 2511(1)(a).

122. The ECPA provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of 18 U.S.C. § 2511. 18 U.S.C. § 2520(a).

123. The transmissions between Plaintiffs and Class Members and Mount Sinai's Website are transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce, and therefore constitute "electronic communications" within the meaning of the ECPA. 18 U.S.C. § 2510(12).

124. The Trackers intercepted the "contents" of Plaintiffs' and Class Members' electronic communications within the meaning of 18 U.S.C. § 2510(8), for the same reasons set forth above with respect to the FSCA.

125. Although the ECPA contains a one-party consent exception, 18 U.S.C. § 2511(2)(d), that exception does not apply where a communication is intercepted for the purpose of committing a criminal or tortious act in violation of federal or state law. Mount Sinai procured these interceptions at least in part for the purpose of disclosing and using its patients' and

prospective patients' individually identifiable health information through third-party advertising and analytics systems to obtain commercial advantages, including conversion measurement, retargeting, audience building, and patient acquisition. The same disclosure and use of individually identifiable health information—separate from the act of interception itself—violated HIPAA's criminal prohibition, 42 U.S.C. § 1320d-6, where undertaken knowingly and with intent to transfer or use the information for commercial advantage. That same disclosure independently constituted the tort of breach of confidence, as alleged in Count III below. The transmission of physician, specialty, and scheduling communications with persistent identifiers; Mount Sinai's configuration of patients' scheduling actions as advertising conversions; its placement of advertising technologies on the very functions through which patients seek care; and its continued receipt of advertising and patient-acquisition benefits support the inference of that unlawful purpose. Whether Mount Sinai possessed that purpose and the requisite knowledge is a fact-intensive issue that should be resolved on a complete evidentiary record. *See Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *4 (N.D. Ill. Feb. 21, 2025); *W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *6–7 (M.D. Fla. Mar. 6, 2025); *Kurowski v. Rush Sys. for Health*, 2023 WL 2349606 (N.D. Ill. Mar. 3, 2023).

126. Mount Sinai's knowing violation of HIPAA is supported by, among other things, its own publication of a HIPAA notice and its awareness of the HHS Office for Civil Rights guidance described above.

127. That Mount Sinai may have been motivated by commercial purposes does not preclude application of the crime-tort exception. *See Stein*, 2025 WL 580556, at *6 ("The language of the statute gives no hint that conduct falls outside the reach of the statute if a person acted based on financial motivations.").

128. Mount Sinai intentionally procured the Third-Party Recipients to intercept these electronic communications by deliberately implementing the Trackers on its Website, within the meaning of 18 U.S.C. § 2511(1)(a). Visitors did not consent to Mount Sinai's procurement of third-party interception or to the sharing of the physicians and specialties they sought, their scheduling actions, and associated identifiers for advertising, analytics, retargeting, or conversion-measurement purposes.

129. Mount Sinai was not acting under color of law when procuring these interceptions, and no other exception to ECPA liability applies.

130. As a direct result of Mount Sinai's violations, Plaintiffs and Class Members are entitled to: (a) actual damages, or statutory damages of the greater of $100 per day for each day of violation or $10,000; (b) punitive damages; and (c) reasonable attorneys' fees and other litigation costs reasonably incurred. 18 U.S.C. § 2520(b)–(c). Plaintiffs and Class Members are also entitled to such preliminary and other equitable or declaratory relief as may be appropriate. 18 U.S.C. § 2520(b)(1).

**COUNT III**
**Breach of Confidence**
**(On Behalf of Plaintiffs and the Nationwide Class)**

131. Plaintiffs incorporate paragraphs 1–109 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Nationwide Class.

132. A common law breach of confidence claim requires an "unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship." Muransky v. Godiva Chocolatier, Inc., 979 F.3d 917, 932 (11th Cir. 2020) (en banc). The claim "is rooted in the concept that the law should recognize some relationships as confidential to encourage uninhibited discussions between the parties involved,"

and traditionally arises in the context of close professional relationships, such as those between patients and medical providers. Id.

133. Under Florida law, a confidential relationship exists where "confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused." Doe v. Evans, 814 So. 2d 370, 374 (Fla. 2002). Whether a confidential relationship exists is typically a question of fact not appropriately resolved on a motion to dismiss.

134. A confidential relationship existed between Mount Sinai and Plaintiffs and Class Members. Mount Sinai is a hospital. It furnishes medical care, publishes a HIPAA notice representing that it safeguards patients' health information, and invites visitors to use its Website to locate its physicians by specialty and to schedule care with them. Visitors reposed confidence in Mount Sinai when communicating with it through the Website for that purpose, and Mount Sinai accepted that trust. Plaintiffs' relationship with Mount Sinai extends well beyond a single interaction with a public-facing website: each is a Mount Sinai patient, and each used the Website on more than one occasion to locate Mount Sinai physicians from whom she sought care.

135. The information Mount Sinai disclosed is nonpublic. It consists of the specific physicians and specialties Plaintiffs and Class Members sought, the clinical services they researched, and their steps to schedule care with Mount Sinai physicians. None of this information was publicly available. It existed only because visitors communicated it to Mount Sinai, and Mount Sinai learned it within the confidential relationship described above.

136. Mount Sinai disclosed that nonpublic information to third parties. By deploying and procuring the Trackers on the Website, Mount Sinai caused visitors' communications to be transmitted in real time to Google and StackAdapt, together with persistent cookies and identifiers—including, for visitors signed into Google, their logged-in Google account cookies—

permitting those recipients to link the communications to the same browser, device, account, or user. The Third-Party Recipients are advertising and analytics companies that play no role in furnishing visitors' medical care, and they received the information for their own independent commercial purposes. *See W.W. v. Orlando Health, Inc*., 2025 WL 722892, at *8 (M.D. Fla. Mar. 6, 2025) (allegations that tracking technologies gathered and transmitted a plaintiff's protected health information, including searches for physicians, medical conditions, and treatment-related information, to Meta and Google sufficiently stated a claim for breach of confidence).

137. The disclosures were unconsented and unprivileged. Plaintiffs and Class Members were never presented with Terms of Use, a clickwrap, or any other affirmative request for permission; any cookie notice was notice-only and appeared after the Trackers had already fired, and they never authorized Mount Sinai to disclose their health-related communications to advertising and analytics companies. Mount Sinai's Privacy Policy did not obtain consent, named neither recipient, and disclaimed application to protected health information. No privilege, authorization, or other legal justification permitted these disclosures; to the contrary, HIPAA prohibited them, and Mount Sinai obtained no HIPAA-compliant authorization from any visitor.

138. Mount Sinai breached the confidence reposed in it. It made the deliberate decision to deploy and procure the Trackers on precisely those functions through which patients seek care—its physician profiles, its clinical service pages, its search function, and its scheduling flow—and it did so with knowledge, including from the HHS Office for Civil Rights guidance described above, that doing so transmits protected health information to third-party vendors. Mount Sinai could have declined to place tracking technologies on those functions. Instead it maintained them and accepted the advertising, analytics, attribution, audience, and patient-acquisition benefits the disclosures produced.

139. As a direct and proximate result of Mount Sinai's breach of confidence, Plaintiffs and Class Members have been injured. They suffered an invasion of privacy, lost control over their confidential health information, sustained a diminished ability to seek medical information and care in confidence, and face the ongoing risk that the disclosed information will be further processed, combined with other data, and used for profiling and targeted advertising. Plaintiffs and Class Members are entitled to compensatory and nominal damages, and to injunctive relief prohibiting Mount Sinai from further disclosing their confidential information without consent.

**COUNT IV**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Nationwide Class, Pleaded in the Alternative)**

140. Plaintiffs incorporate paragraphs 2–4, 13–61, 76–87, and 94–109 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Nationwide Class. This Count does not incorporate paragraphs 62–66 or 67–75, or the injury allegations of paragraphs 88–93, because this Count does not depend on any of them.

141. Plaintiffs plead this Count in the alternative to Counts I, II, III, and V, and to the extent Plaintiffs and Class Members are found to have no adequate remedy at law. This Count does not rely on Mount Sinai's statutory violations or its breach of confidence to supply the unjust factor. It rests instead on the independent equitable principle that Mount Sinai solicited, received, and retained the benefit of Plaintiffs' and Class Members' valuable personal and health-related data without conferring any compensation in return, and that retaining that benefit without paying its fair value is inequitable irrespective of whether the conduct that produced it is ultimately adjudged unlawful.

142. Mount Sinai received a benefit from Plaintiffs and Class Members by inducing them to provide valuable personal and health-related data through the Website's search function,

physician profiles, clinical service pages, and scheduling flow, and then putting that data to use for its own commercial purposes.

143. By implementing the Trackers on its Website, Mount Sinai obtained analytics, conversion-measurement, retargeting, audience-building, advertising-attribution, and patient-acquisition benefits. Those benefits enabled Mount Sinai to measure and improve the efficiency of its advertising, attribute appointment requests to its advertising campaigns, retarget prospective patients, and increase the volume of appointments and services, thereby enriching itself at the expense of Plaintiffs and Class Members.

144. Private information, at least in the context of sensitive health-related information, has value. *See W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *10.

145. Mount Sinai knowingly accepted and retained the advertising, analytics, attribution, audience, and patient-acquisition benefits produced through the challenged transmissions. Mount Sinai has never compensated Plaintiffs or Class Members for the data that generated those benefits, and it would be inequitable for Mount Sinai to retain the value it received without paying fair value for it.

146. Because Mount Sinai retained a benefit conferred by Plaintiffs and Class Members without paying its fair value, Plaintiffs and Class Members are entitled to restitution and disgorgement of the profits, benefits, and other compensation Mount Sinai obtained from the use of their personal and health-related data.

**COUNT V**
**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**(Fla. Stat. § 501.201, et seq.)**
**(On Behalf of Plaintiffs and the Florida Class — Declaratory and Injunctive Relief Only)**

147. Plaintiffs incorporate paragraphs 1–109 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Florida Class.

148. FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). The Act is to be construed liberally to protect the consuming public. Fla. Stat. § 501.202(2).

149. Mount Sinai is engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8): it advertises, solicits, offers, provides, and bills for medical services to consumers in Florida, and it operates the Website to market those services and to acquire patients.

150. Plaintiffs seek no damages under this Count. Plaintiffs bring this Count solely for the declaratory and injunctive relief that Fla. Stat. § 501.211(1) affords to "anyone aggrieved by a violation" of the Act, together with the attorneys' fees and costs available under Fla. Stat. § 501.2105. Actual damages are not an element of a claim for declaratory or injunctive relief under § 501.211(1); that requirement applies only to a claim for damages under § 501.211(2). *See Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. 1st DCA 2000). Plaintiffs expressly disclaim any recovery of damages under this Count.

151. Plaintiffs are persons aggrieved by Mount Sinai's violations: each used the Website to locate Mount Sinai physicians and had the contents of those communications disclosed to the Third-Party Recipients as a result of the practices described below.

152. Mount Sinai's conduct is unfair. Disclosing patients' physician, specialty, and scheduling communications to advertising and analytics companies, and reporting patients' efforts to schedule care as advertising conversions, without notice or consent, offends established public policy protecting the confidentiality of health information, and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. Consumers cannot reasonably avoid that

injury, because the transmissions occur invisibly, on page load, before any disclosure could be read, and it is not outweighed by any countervailing benefit to consumers or competition.

153. Mount Sinai's conduct is deceptive by omission. Mount Sinai failed to disclose, and failed adequately to disclose, that it transmits the physicians and specialties visitors seek, and their scheduling actions, to Google's advertising systems and to StackAdapt, joined to persistent advertising identifiers and Google account cookies. Instead, its Privacy Policy described its practices only generically, named neither recipient, and represented that it does not apply to protected health information—conveying to a reasonable consumer that his or her health-related communications with the hospital were not among the "website activity" shared with vendors. That omitted fact would be material to a reasonable consumer's decision whether to use the Website to locate a physician or schedule care.

154. Mount Sinai's conduct is also unlawful, and an act that violates another law is an unfair or deceptive practice under FDUTPA. Mount Sinai's procurement of the interception of Plaintiffs' and Class Members' electronic communications violates Fla. Stat. § 934.03, as alleged in Count I.

155. Declaratory and injunctive relief is necessary and appropriate. As the demonstrative capture described in Section E confirms, Mount Sinai continues to deploy the Trackers on its physician profiles, service pages, and scheduling flow; continues to present no Terms of Use and only a notice-only cookie banner that obtains no consent; and continues to omit the Third-Party Recipients from its Privacy Policy. Plaintiffs remain Mount Sinai patients and would continue to use the Website to locate physicians and schedule care were the practices enjoined. Absent an injunction, Plaintiffs, Class Members, and the consuming public will continue to be subjected to the same practices.

156. Plaintiffs, on behalf of themselves and the Florida Class, are entitled to a declaration that the practices described above violate Fla. Stat. § 501.204, to a permanent injunction under Fla. Stat. § 501.211(1) restraining those practices, and to reasonable attorneys' fees and costs under Fla. Stat. § 501.2105.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all other Class Members similarly situated, respectfully request that this Court:

(a) Certify this case as a class action on behalf of the proposed Class, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel;

(b) Declare that Mount Sinai's actions, as described herein, violate the FSCA, the ECPA, and FDUTPA and constitute a breach of confidence and unjust enrichment;

(c) Award Plaintiffs and the Class compensatory damages in an amount to be determined at trial;

(d) Award Plaintiffs and the Class statutory and liquidated damages as provided by the FSCA and the ECPA;

(e) Award Plaintiffs and the Class punitive damages;

(f) Award Plaintiffs and the Class restitution and disgorgement of all profits, benefits, and other compensation Mount Sinai obtained from the use of Plaintiffs' and Class Members' personal and health-related data;

(g) Enter a declaratory judgment and a permanent injunction under 18 U.S.C. § 2520(b)(1) and Fla. Stat. §§ 501.211(1) and 934.10(1)(a) requiring Mount Sinai to cease procuring the interception of Website visitors' communications without the consent of all parties; to disable or segregate the Trackers from its physician

profiles, clinical service pages, search function, scheduling flow, and other health-related functions unless valid prior consent and authorization are obtained; to cease reporting visitors' scheduling actions to third-party advertising platforms; to request the deletion of improperly transmitted data from the Third-Party Recipients to the extent within Mount Sinai's control or contractual rights; and to disclose accurately and conspicuously every third party to which it transmits visitors' health-related communications;

(h) Award Plaintiffs and the Class pre-judgment and post-judgment interest;

(i) Award Plaintiffs and the Class reasonable attorneys' fees and costs, as allowed by law, including under 18 U.S.C. § 2520(b)(3) and Fla. Stat. §§ 934.10(1)(d) and 501.2105; and

(j) Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: October 5, 2026

Respectfully submitted,

By: */s/ Adam A. Schwartzbaum*
Adam A. Schwartzbaum, Esq.
Florida Bar No. 93014
SCHWARTZBAUM
14 NE 1st Ave Ste 705
Miami, FL 33132
Telephone: 786-453-8485
Primary Email: adam@schwartzbaum.com
Secondary Email:
admin@schwartzbaum.com

*Counsel for Plaintiffs and the Proposed Class*